## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

REBECCA M.,[1]

                                    Plaintiff,

      v.                                       6:24-CV-1108
                                              (DNH/MJK)

LELAND DUDEK,
Acting Commissioner of Social Security

                                 Defendant.

HOWARD D. OLINSKY ESQ., for Plaintiff
JASON PECK ESQ., Special Asst. U.S. Attorney, for Defendant

MITCHELL J. KATZ, U.S. Magistrate Judge

TO THE HONORABLE DAVID N. HURD, Senior U.S. District Judge:

### REPORT- RECOMMENDATION

Plaintiff commenced this action under the Social Security Act (42 U.S.C. § 405(g)) seeking judicial review of the Commissioner of Social Security's final decision denying his application for benefits. Plaintiff did not consent to the jurisdiction of a Magistrate Judge (Dkt. No. 4) so the Honorable David N. Hurd, Senior U.S. District Judge, referred this matter to the Court for Report and Recommendation under 28 U.S.C. § 636(b) and Local Rule 72.3(d). Both parties

---

[1] In accordance with guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Northern District of New York in June 2018 to better protect personal and medical information of non-governmental parties, this Memorandum-Decision and Order will identify the plaintiff using only his first name and last initial.

filed briefs (Dkts. 9, 10, 11), which the Court treats as motions under Fed. R. Civ. P. 12(c), in accordance with General Order 18.

## I. PROCEDURAL HISTORY

On June 7, 2021, Plaintiff applied for Supplemental Security Income under Title II alleging disability beginning on May 11, 2021. (T. 11).[2] Her claim was initially denied on September 20, 2021, and upon reconsideration, on March 31, 2022. (*Id.*). Administrative Law Judge ("ALJ") Jennifer Smith held a telephonic hearing on August 10, 2023. (T. 43-90). At this hearing, non-attorney representative, Kimberly MacDougall, appeared on Plaintiff's behalf. (T. 11). Both Plaintiff and impartial vocational expert, Elizabeth Pasikowski testified. (T. 49-79; 79-90)*.* On February 23, 2024, the ALJ issued an unfavorable decision. (T. 8-29). Plaintiff timely appealed by filing the operative complaint. (Dkt. 1).

## II. GENERALLY APPLICABLE LAW

### A. Disability Standards

To be considered disabled, plaintiffs seeking Disability Insurance or Supplemental Security Income benefits must establish that they are "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which

---

[2] All page references are to the Administrative Transcript ("T.") and not the page numbers assigned by the CM/ECF pagination system.

has lasted or can be expected to last for a continuous period of not less than twelve

months …" 42 U.S.C. § 1382c(a)(3)(A). In addition, plaintiffs'

> physical or mental impairment or impairments [must be] of such
> severity that [they are] not only unable to do [their] previous work but
> cannot, considering [their] age, education, and work experience, engage
> in any other kind of substantial gainful work which exists in the national
> economy, regardless of whether such work exists in the immediate area
> in which [they] live[], or whether a specific job vacancy exists for
> [them], or whether [they] would be hired if [they] applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§

404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity. If [they are] not, the
> [Commissioner] next considers whether the claimant has a "severe
> impairment" which significantly limits [their] physical or mental ability
> to do basic work activities. If the claimant suffers such an impairment,
> the third inquiry is whether, based solely on medical evidence, the
> claimant has an impairment which meets or equals the criteria of an
> impairment listed in Appendix 1 of the regulations. If the claimant has
> such an impairment, the [Commissioner] will consider [them] disabled
> without considering vocational factors such as age, education, and work
> experience … Assuming the claimant does not have a listed
> impairment, the fourth inquiry is whether, despite the claimant's severe
> impairment, [they have] the residual functional capacity to perform
> [their] past work. Finally, if the claimant is unable to perform [their]
> past work, the [Commissioner] then determines whether there is other
> work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 20 C.F.R. §§

404.1520, 416.920. Plaintiffs have the burden of establishing disability at the first

four steps. *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013). If they establish that

their impairment prevents them from performing their past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

### B. Scope of Review

When reviewing a final decision of the Commissioner, courts must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *See id.* at 417; *see also Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* But this standard is a very deferential standard of review "—even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448. "To determine on appeal whether an ALJ's findings are supported by substantial evidence, reviewing courts consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, reviewing courts may not substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Id.*; *see also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

ALJs are not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g.*, *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) ("[W]e are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony[.]"). But ALJs cannot "'pick and choose' evidence in the record that supports [their] conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *see also Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III. <u>FACTS</u>

The record includes Plaintiff's medical and mental health treatment history which the parties are familiar with. The Court will refer to the pertinent medical records and Plaintiff's hearing testimony in its analysis of the parties' claims, as appropriate.

## IV. <u>THE ALJ'S DECISION</u>

At step one of the five-step-sequential analysis, the ALJ determined that Plaintiff met the insured status requirements through December 31, 2026. (T. 13). The ALJ also noted that although Plaintiff "has done some part-time work" it "does not rise to the level of . . . substantial gainful activity." (*Id.*).

At step two, the ALJ determined that Plaintiff had the following severe impairments: "bilateral arthritis of the knees, bilateral carpal tunnel syndrome,

fibromyalgia, asthma, COPD, obesity, a depressive disorder, an anxiety disorder, a personality disorder, a delusional disorder, and PTSD." (*Id.* at 13-14) (citations omitted).

At step three, the ALJ determined that Plaintiff did not have a single impairment, or combination of impairments, that equals the severity of impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. (T. 14).

The ALJ also discussed the "paragraph B" criteria. (T. 15). "To satisfy the paragraph B criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning." (*Id.*). These areas of functioning are: (1) understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; or (4) adapting and managing oneself. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A)(2)(b).

Here, the ALJ found that Plaintiff had moderate limitations on her ability to: (1) understand, remember, or apply information, (2) interact with others, (3) concentrate, persist, or maintain pace, and (4) adapting or managing herself. (T.15-16). As a result, the paragraph B criteria was not met. *Id.*

Next, the ALJ discussed the "paragraph C" criteria. (T. 16). Paragraph "C" requires a medically documented history of the existence of the disorder over a period of at least two years, with evidence of both (a) medical treatment, mental

6

health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of the mental disorder; and (b) marginal adjustment, that is, minimal capacity to adapt to changes in environment or to demands that are not already part of daily life. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A)(2)(c)

The ALJ held that the Plaintiff did not satisfy the paragraph "C" criteria because she "continues to receive medical treatment, mental health therapy, and some psychosocial support, but has not required placement in a hospital, board and care facility, day treatment program, or other environment that provides a highly supportive living arrangement for persistent or uncontrolled psychiatric symptoms." (T. 16). Additionally, the ALJ noted that "the degree of limitation identified by the other sources, including the finding that even a minimal increase in mental demands or changes in environment would be predicted to cause the claimant to decompensate, is not supported by the claimant's overall response to ongoing mental health treatment" (*Id.*).

Subsequently, the ALJ determined that Plaintiff has the residual function capacity (RFC) to:

> perform light work as defined in 20 CFR 404.1567(b) except she should not work at unprotected heights or in close proximity to dangerous machinery or moving mechanical parts of equipment. The claimant should not climb ladders/ropes/scaffolds, balance (as defined in the SCO), kneel, crouch or crawl. She can occasionally climb ramps/stairs and stoop. The claimant can frequently handle, finger and feel. She

should have no more than occasional concentrated exposure to respiratory irritants such as dust, odors, fumes, gases, wetness, humidity and extreme hot/cold temperatures. The claimant can understand, remember and carry out simple instructions. She can use judgment to make simple, work-related decisions. The claimant can work at a job with no more than occasional changes in the routine work setting. She cannot perform work requiring a specific production rate, such as an assembly line, or work that requires hourly quotas. She can have occasional contact with coworkers and supervisors but no contact with the public.

(T. 17).

In making the RFC determination, the ALJ stated that she "considered all" of Plaintiff's symptoms and "the extent to which those symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" (*Id.*). The ALJ further noted that she considered "the medical opinion(s) and prior administrative medical finding(s)" pursuant to 20 C.F.R. §§ 404.1520c. (*Id.*).

At step four, the ALJ found that Plaintiff "is unable to perform any past relevant work" (T. 21) (internal citations omitted).

But at step five, the ALJ held that there are a "significant" number of jobs in the national economy that Plaintiff could do. (T. 22).

Accordingly, the ALJ determined that Plaintiff was not disabled, as defined in the Social Security Act, from the onset date through the decision date. *Id.*

## V. ISSUES IN CONTENTION

Plaintiff argues that the ALJ's decision should be reversed and remanded because "the ALJ's RFC decision is not supported by substantial evidence." (Pl. Br.

at 8) (cleaned up). Specifically, Plaintiff argues "the ALJ improperly evaluated the medical opinion of treating psychiatrist David Pierce, M.D." (*Id.*). In opposition, the Commissioner argues that the ALJ appropriately considered all record evidence when making her determination. (Def. Br. at 5-16).

## VI. DISCUSSION

For the reasons stated below, the Court agrees with Plaintiff. The ALJ failed to adequately explain how she reached her decision. And what is explained, shows that the ALJ used medical source opinions of *thought process* to find Dr. Pierce's medical opinion on *thought content* unsupported and inconsistent with the record. This was an error. As a result, the Court recommends reversing the ALJ's decision and remanding the case for further proceedings.

### A. Legal Standard

RFC is "what [the] individual can still do despite [their] limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular continuing basis … A 'regular and continuing basis' means eight hours a day, five days a week, or an equivalent work schedule." *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (quoting *Melville v. Apfel*, 198 F. 3d 45, 52 (2d Cir. 1999)) (quoting SSR 96-8p, 1996 WL 374184, at *2).

In their RFC determinations, ALJs must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. *See* 20 C.F.R. §§ 404.1545, 416.945; *see also Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) ("the ALJ must consider the claimant's RFC, age, education, past work experience, and transferability of skills to determine if the claimant can perform other work existing in the national economy."); *Genier v. Astrue*, 606 F. 3d 46, 49 (2d Cir. 2010) ("When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.") (internal citations omitted).

ALJs must specify the functions a plaintiff can perform and may not simply make conclusory statements regarding a plaintiff's capacities. *See Roat v. Barnhart*, 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010); *see also Martone*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F. 2d 582, 588 (2d Cir. 1984)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *See Natashia R. v. Berryhill*, No. 3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing SSR 96-8p, 1996 WL

374184, at *7); *see also Angelo Michael G. v Kijakazi*, No. 6:22-CV-00892
(TWD), 2023 WL 4763792 (N.D.N.Y. July 26, 2023) (quoting *Ferraris*, 728 F. 2d
at 587). "[A]n RFC finding is administrative in nature, not medical, and its
determination is within the province of the ALJ." *Curry v. Comm'r of Soc. Sec.*,
855 Fed. App'x 46, 49 n.3 (2d Cir. 2021) (citing 20 C.F.R. § 404.1527(d)(2)).

    Furthermore, it is within the ALJ's discretion to resolve genuine conflicts in
the evidence. *See Veino v. Barnhart*, 312 F. 3d 578, 588 (2d Cir. 2002); *see also*
*Schaal v. Apfel*, 134 F. 3d 496, 504 (2d Cir. 1998) ("It is for the SSA, and not this
court, to weigh the conflicting evidence in the record"); *Cage v. Comm'r of Soc.*
*Sec.*, 692 F. 3d 118, 122 (2d Cir. 2012) ("In our view, we defer to the
Commissioner's resolution of conflicting evidence.").

### B. Analysis

    A provider's relationship with a claimant—a factor the ALJ must contend
with—cannot be overlooked. Even though the Commissioner no longer gives
controlling weight to any medical opinions, the agency must evaluate all medical
opinions based on their "supportability; consistency; relationship with the
claimant; specialization; and other factors." *Annjeanette B. v. Kijakazi*, No. 3:22-
CV-198 (ATB), 2023 WL 3040663 at *4 (N.D.N.Y. Apr. 21, 2023) quoting 20
C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c). Generally, there is no requirement that
ALJs "explicitly discuss" a provider's relationship with the claimant,

specialization, and other factors. *Annjeanette B.*, 2023 WL 3040663 at \*5. But the "length of the treatment relationship," "frequency of examination," and nature of the "examining relationship" affect the analysis. 20 C.F.R. § 416.920c(3)(i)-(v). In fact, the longer the treating relationship between a claimant and provider, the more weight the ALJ should give the provider's opinion because "a one-time snapshot of a claimant's status may not be indicative of their longitudinal mental health." *Estrella v. Berryhill*, 925 F.3d 90, 98 (2d Cir. 2019); *accord Loucks v. Kijakazi*, No. 21-1749, 2022 WL 2189293 (2d. Cir. 2022) (acknowledging that consultative exams "analyze the patient's mental state only at the time of the examination and do not consider symptoms the patient may experience outside of that brief period of time").

The ALJ erred by improperly using medical opinions analyzing Plaintiff's *thought process* to find treating psychiatrist, Dr. David Pierce's, medical opinion of Plaintiff's *thought content* unsupported by the record. To begin, Dr. Pierce—who treated Plaintiff three times from September 2022 to June 2023—opined that Plaintiff's paranoia "undermines" her "efforts to establish social supports and leads to frequent interpersonal conflicts in social and occupations settings." (T. 899) (cleaned up). The ALJ, analyzing what the Court presumes is the supportability factor, rejected this opinion by noting that "records describe coherent, and goal directed thought processes." (T. 21). To support this assertion, the ALJ relies on

consultative examiner, Dr. David Schaich, Psy.D.'s, one-time assessment that Plaintiff's "thinking was coherent, and goal-direct[ed] with no evidence of. . . paranoia *in [an] evaluation setting*." (T.1434) (emphasis added). But there is a difference between thought process and thought content.

And Dr. Pierce's psychiatric evaluation, unlike Dr. Schaich's evaluation, distinguishes between 'thought process' and 'thought content.' (T. 103, 104, 893)[3]. According to Dr. Pierce's evaluation form, thought process assessments include determining whether the patient is logical, coherent, goal directed, circumstantial, tangential, incoherent, disorganized, has flight of ideas, has loosening of associations, and more. (T. 893). On the other hand, thought content assessments include determining whether a patient has paranoid ideations, phobias, obsessions, compulsions, grandiose delusions, religious delusions, persecutory delusions, somatic delusions, referential delusions, thought insertion, thought withdrawal, thought blocking, and more. (*Id.*). In plainer terms, "thought process describes how

---

[3] Dr. David Schaich's consultative exam results do not differentiate between thought process and thought content. But separating those two categories seems to be normal practice for a psychiatrist. *See McLean v. Comm'r of Soc. Sec.,* No. 19-CV-6068 (JS), 2023 WL 8021473 at *2-3 (E.D.N.Y. Nov. 20, 2023) (finding that psychiatrist Dana Cohen found that her patient had "normal thought process" and "unremarkable thought content"); *Poole v. Saul,* 462 F. Supp. 3d 137, 156-157 (D. Conn. 2020) (acknowledging that Dr. Nancy Kelly, a psychology specialist and consultative examiner, found the plaintiff's thought process and thought content were normal on several occasions); *Reid v. O'Malley,* No. 23-CV-5280 (JLC), 2024 WL 1700034 at * 6 (S.D.N.Y. Apr. 19, 2024) (finding that Mildred Riley-Channer, LMSW determined that Plaintiff had "otherwise normal" "thought process" and "thought content"). Indeed, psychiatrist, L. Haus, Psy. D., another consultative examiner, distinguished between Plaintiff's thought process and thought content. (T. 103-4).

a patient organizes their expressed thoughts" while thought content "is essentially the subject matter of the thoughts." Rachel M. Moss & Joe M. Das, *Mental Status Examination*, Nat'l. Library of Med., (April 30, 2024) https://www.ncbi.nlm.nih.gov/books/NBK546682/. As a result, the ALJ erred by using medical opinions on Plaintiff's thought process to find that Dr. Pierce's findings of thought content were unsupported by the record.

The Commissioner's reliance on Nurse Practitioner Lee Thompson's treatment notes is misplaced. When reasoning that Dr. Pierce's findings of paranoid delusions was unsupported by the record, the ALJ, in addition to relying on Dr. Schiach's medical source statement, relied on NP Thompson's treatment notes. (T. 21). Specifically, the ALJ relied on NP Thompson's finding of "unremarkable behavior." (T.21, 564). Likewise, on this appeal, the Commissioner relies on NP Thompson's finding of "no paranoid delusions elected or endorsed." (Def. Br. at 12).[4] These arguments cannot carry the day for two reasons. First, NP Thompson's finding—that Plaintiff fails to form prosocial work relationships—is consistent with Dr. Pierce's findings—that Plaintiff's paranoia harms her ability to form

---

[4] The Commissioner notes that "these observations [that Plaintiff did not have paranoid thoughts or delusions] were repeated throughout the record as late as 2023. *See e.g.* T. 893-94, 923." But that is incorrect. Page 893 of the record shows that Dr. Pierce identified that Plaintiff suffers from paranoid delusion and paranoid ideas. (T. 893). Likewise, page 923 shows that Dr. Pierce selected other and specified that Plaintiff suffers from paranoid delusions. (T. 923).

proper work relationships. (T. 561, 899). So, NP Thompson's opinion enhances the supportability of Dr. Pierce's finding.

And second, even if the Court took NP Thompson's finding of no paranoid delusion at face value, the ALJ still erred. Dr. Pierce's identification of paranoia comes *after* NP Thompson's finding of no paranoia. *See* (T. 564, 893). So, there is a change in findings (consistency), the different finding was made by someone who specialized in the field (specialization), and the Court cannot glean from the record why the ALJ credited the non-specialist over the specialist (supportability). Yet, the ALJ failed to adequately explain how she arrived at her decision. That is error. *See Loucks,* 2022 WL 2189293 at 2 (2d. Cir. 2022) (finding that "the ALJ committed procedural error by failing to explain how it considered the supportability and consistency of medical opinions in the record").

The ALJ also erroneously failed to assess Sarah Long, Ph.D.'s psychiatric evaluation when reasoning that Dr. Pierce's finding of paranoia was unsupported by the record. (T.21). Despite the ALJ's contention that Dr. Pierce's testimony is unsupported by the record, a fair reading of Dr. Long's opinion shows that Plaintiff had some thought content issues. Dr. Long recommended that Plaintiff engage in "consistent appropriately high clinical level" and frequent "psychotherapy" (T. 474). That recommendation is consistent with Dr. Pierce's treatment for Plaintiff's

paranoia. (T. 890). Thus, Dr. Long's opinion enhances the supportability of Dr. Pierce's opinion.

Analyzing the consistency factor, the ALJ's reasoning can be understood as: Dr. Pierce's treatment notes, describing Plaintiff's paranoia, is not consistent with the record because several records describe her as having normal behavior, thought content, judgement, mood, cognition, and being calm, cooperative, and pleasant. (T. 19) *referencing* (T. 850, 854, 893, 894). But there are two issues with that analysis.

First, the ALJ incorrectly relied on pages 850 and 854 of the record to support her reasoning. Those pages are Plaintiff's physical ailment treatment notes. And it would be puzzling if Plaintiff told the provider—one who could not deal with her mental health issues—about her paranoid delusions. (T. 820); *see also* (T. 73) (testifying that "[NP] Renee Williams" is Plaintiff's "normal doctor"). Surely, in another context, the Commissioner would point out such a puzzling discrepancy.

Second, the ALJ's reliance on pages 893 and 894 was misplaced and does not support her decision. Those pages are Dr. Pierce's medical treatment notes. In those notes, right below the 'thought process' check boxes, which the ALJ relies on, is the 'thought content' check boxes, which indicates that Plaintiff suffers from paranoid ideations. (T. 19; T. 893). The ALJ's decision to pick what supported her argument and ignore what did not was improper. *See Rucker v. Kijakazi*, 48 F.4th

16

86, 94 (2d Cir. 2022) (noting that "it was not permissible for the ALJ to 'cherry-pick' the positive aspects of the progress reports") (citation omitted). If the ALJ was going to rely on one aspect of Dr. Pierce's evaluation to support her position, she needed to address the portion of Dr. Pierce's evaluation that detracted from its weight. *See Williams ex rel. Williams*, 859 F.2d at 258 ("an analysis of the substantiality of the evidence must also include that which detracts from its weight"); *see also Lee F. v. Dudek*, No. 3:24-CV-212 (MJK), 2025 WL 843748 at *7 (N.D.N.Y. Mar. 18, 2025) ("The ALJ's failure to address the *entire* note, contrary to the Commissioner's contention, enhances Plaintiff's argument that the ALJ engaged in impermissible cherry picking.") (emphasis in original).

Altogether, the ALJ did not clearly explain, nor can the Court determine how, Dr. Pierce's finding of paranoia is unsupported or inconsistent with the record. Simply put, the ALJ provided a one-paragraph analysis of Dr. Pierce's notes without even summarizing the doctor's findings. This cursory review and failure to substantively address the medical records of Plaintiff's treating physician is insufficient.

Continuing her consistency analysis, the ALJ wrongly reasoned that Dr. Pierce's paranoia finding is inconsistent with the record because Plaintiff did not submit any inpatient hospitalization records. That argument is not rooted in law. The Court is unaware of any regulation or case, outside the paragraph "C" criteria

analysis, which stands for the proposition that a party *must* have been hospitalized for their mental illness to be supported by the record, especially when there are treatment notes—by the Plaintiff's psychiatrist—showing that she struggles with mental health issues. (T. 890, 922). The Court rejects the ALJ's new in-patient-hospitalization-record requirement.

In opposition to Plaintiff's argument, the Commissioner cites two cases for the proposition that "conservative treatment and no hospitalizations are valid factors for the ALJ to consider." (Pl. Br. at 8) (citing *See*, *e.g.*, *Tricarico v. Colvin*, 681 Fed. App'x 98, 100 (2d Cir. 2017); *Sheila G. v. Comm'r of Soc. Sec.*, No. 5:19-CV-1298 (CFH), 2021 WL 1027047, at *6 (N.D.N.Y. Mar. 17, 2021)).

But neither cited case creates an inpatient-hospitalization-record requirement. The *Tricarico* court, affirming the ALJ's decision, focused on the internal inconsistencies of the provider's treatment plan, the infrequent visits between the plaintiff and the provider, the plaintiff's refusal of surgical care, and the provider's assessment contradicting both the plaintiff's and the consultative examiner's statements. *See Tricarico*, 61 Fed. App'x, at 100. But here, there were no internal inconsistencies within Dr. Pierce's treatment notes. And notably, Plaintiff's testimony of paranoia matched Dr. Pierce's notes. (T. 77-78, 890, 922).

The Commissioner also argues that Plaintiff's paranoia is not under control because of her own refusal to take medicine. (Def. Br. at 13). But that argument is

unpersuasive for two reasons. First, the *Tricarico* court noted that the plaintiff—who suffered from obesity and back and knee disorders—declined surgical care by multiple providers, but he was able to perform full squats, could "walk on his heels and toes without difficulty, used no assistive devices, needed no help changing for the examination or getting on and off the examination table and was able to rise from the chair without difficulty." *See Tricarico v. Colvin*, No. 14-CV-2415 (RRM), 2015 WL 5719696 at *7 (E.D.N.Y. Sept. 28, 2015); *Tricarico v. Colvin*, 681 F. App'x at 101. In other words, the *Tricarico* plaintiff did not need surgery. Here, on the other hand, Plaintiff, who refuses to take psychotropic medication, receives cognitive behavioral therapy and benefits from such treatment. (T. 890). In other words, because Plaintiff receives some treatment and still struggles with her mental health issue, this case is unlike *Tricarico*.

And second, the Commissioner cannot hold Plaintiff's decision to refuse psychotropic medication against her if the ALJ did not ask Plaintiff why she refused the medicine. *See Steficek v. Barnhart*, 462 F. Supp. 2d 415, 420 (W.D.N.Y. 2006) (citing *Berger v. Barnhart,* No. 06–C–0256, 2006 WL 3246260, at *10 (W.D.Wisc. Nov. 7, 2006) ("Before drawing an adverse inference from plaintiff's failure to pursue Dr. Paul's recommendations, the ALJ should have asked plaintiff to explain why he did not pursue the recommended treatment") (citing SSR 96–7p); *Witt v. Barnhart,* 446 F.Supp.2d 886, 901 (N.D.Ill.2006) ("the ALJ should ask

the claimant whether there is a good reason for a failure to procure medical assistance before drawing a negative credibility inference") (citing SSR 96–7p)).

The Commissioner's other case is also distinguishable. The *Sheila G.* court noted that Plaintiff's HIV and kidney issues were "well controlled by treatment and medication." *Sheila G.,* 2021 WL 1027047, at *6. That is not the case here. Plaintiff changed her home locks because she has a fear that someone will break into her apartment. (T. 890). She also told Dr. Pierce: "I don't care if you don't believe me, but a group of people have used phishing to download spyware onto my phone and they have been listening to what I say. I'm fed up with this and I'm setting boundaries" (T. 922). In short, Plaintiff's treatment notes show that her paranoia is not well controlled by treatment and because the ALJ did not ask Plaintiff why she refuses to take psychotropic medicine, this Court cannot determine if her paranoia would be controlled by medicine. In consequence, this Court cannot determine whether there is more Plaintiff can do to treat her paranoid thoughts. As a result, *Sheila G.* is distinguishable.

* * *

"Although the Court finds the ALJ committed procedural error, this is not the end of the analysis." *Daniel M. S. v. Comm'r of Soc. Sec.*, No. 5:24-CV-379 (BKS/TWD), 2025 WL 957411 at *4 (N.D.N.Y. Mar. 31, 2025). The Court must consider whether the error was harmless. *See Loucks*, 2022 WL 2189293 at *2.

Here, the ALJ's decision was not harmless. A searching review cannot assure the Court that the ALJ properly analyzed the supportability, consistency, relationship with the claimant factors, and specialization factors. Indeed, a proper analysis may lead the ALJ to a different RFC outcome. As a result, the ALJ's error was not harmless

\* \* \*

All in all, the ALJ failed to adequately address Dr. Pierce's treatment notes, which details Plaintiff's paranoia. While the new regulations do not require ALJ's to give controlling weight to treating physicians, the ALJ cannot ignore the factors. Ignoring the relationship with the claimant factor, and its subparts (the length of the treatment relationship, the frequency of exams, the purpose of the treatment relationship, the extent of the treatment relationship, and the examining relationship) would be a post-hoc rewriting of the regulations to deny benefits. The Court should not permit such conduct.

As a result, this Court recommends reversing the ALJ's decision and remanding the case for a new hearing.

## V. CONCLUSION

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that Plaintiff's motion for judgment on the pleadings (Dkt. 9) be **GRANTED**; and it is further

**RECOMMENDED**, that Defendant's motion for judgment on the pleadings (Dkt. No. 10) be **DENIED**; and it is further

**RECOMMENDED**, that the decision of the Commissioner be **REVERSED** and **REMANDED** to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with the Report and Recommendation.

Under 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Hum. Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: May 19, 2025
      Syracuse, New York

_____
Hon. Mitchell J. Katz
U.S. Magistrate Judge